UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

PETER P. MORALES,               :
                                :
                    Plaintiff,  :          **OPINION AND ORDER**
                                :
        -against-               :          17-CV-9315 (JLC)
                                :
NANCY A. BERRYHILL, Acting      :
Commissioner, Social Security   :
Administration,                 :
                                :
                    Defendant.  :

---------------------------------------------------------------X

**JAMES L. COTT, United States Magistrate Judge.**

Plaintiff Peter P. Morales, whose claim for benefits has been pending for more than 15 years, seeks judicial review of the latest decision by defendant Nancy A. Berryhill, the Acting Commissioner of the Social Security Administration, denying his claim for Disability Insurance Benefits and Supplemental Security Income under the Social Security Act. Morales has moved for judgment on the pleadings and, given the passage of time and development of the record, requests that the Court reverse the Commissioner's decision and remand the case solely for the calculation of benefits. The Commissioner has cross-moved for judgment on the pleadings. While she consents to reversal, the Commissioner contends that the Court should remand the case for further administrative proceedings instead of solely for the calculation of benefits. For the reasons set forth below, Morales' motion is granted in part, the Commissioner's cross-motion is granted in part, and

the case is reversed and remanded for further administrative proceedings to be completed within 120 days of the date of this Opinion and Order.

## I. BACKGROUND

### A. Procedural History

Morales originally filed an application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on August 22, 2003, alleging that he had been disabled since January 1, 2002. Administrative Record ("AR") dated April 9, 2018, Dkt. No. 16, at 63. The Social Security Administration ("SSA") denied Morales' application on February 13, 2004. *Id.* at 47–51. Morales challenged the denial and appeared before Administrative Law Judge Paula Garrety on October 4, 2005. *Id.* at 409–38. ALJ Garrety's decision, issued January 5, 2006, concluded that Morales was not eligible for benefits. *Id.* at 33. After the Appeals Council denied his request for review on May 25, 2007, Morales filed an action in District Court, seeking judicial review of the decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). *Id.* at 5, 472. On January 9, 2008, the Court remanded the case by stipulation for further administrative proceedings. *Id.* at 468–69.

In his second administrative round, Morales appeared before ALJ Kenneth Levin on March 23, 2009. *Id.* at 609–52. On April 9, 2009, ALJ Levin concluded that Morales was not eligible for benefits. *Id.* at 467. After Morales failed to timely submit written exceptions to the Appeals Council, ALJ Levin's decision became the Commissioner's final decision. *Id.* at 439. Morales sought judicial review of the

decision, and on July 1, 2013, the Court again remanded the case by stipulation for further administrative proceedings. *Id.* at 735.

In his third administrative round, Morales appeared before ALJ Robert Dorf on February 28, 2014. *Id.* at 763. On May 5, 2014, ALJ Dorf found Morales was not eligible for benefits in the period after October 6, 2002. *Id.* at 689. ALJ Dorf did find that Morales qualified for benefits in the period between June 28, 1999 and October 6, 2002. *Id.* at 676–77. However, the Appeals Council ultimately sent the case back to ALJ Dorf because the hearing tape had been certified as lost. *Id.* at 663.

Morales again appeared before ALJ Dorf on March 29, 2017 in his fourth administrative round. *Id.* at 655. On September 28, 2017, ALJ Dorf again concluded that Morales was not disabled. *Id.* at 659. In this decision, however, ALJ Dorf found for the first time that Morales had engaged in substantial gainful activity since October 2002, and chose not to address any other issues as to whether Morales was disabled. *Id.* at 658–60. Morales did not file written exceptions with the Appeals Council and chose instead to request judicial review of the decision on November 28, 2017. Dkt. No. 1. The parties consented to my jurisdiction for all purposes under 28 U.S.C. § 636(c) on December 18, 2017. Dkt. No. 12. The Commissioner answered Morales' complaint by filing the administrative record on March 8, 2018, and re-filed the record on April 9, 2018. Dkt. No. 16.

On June 5, 2018, Morales moved for judgment on the pleadings and submitted a memorandum in support of his motion ("Pl. Mem."). Dkt. Nos. 17–18.

The Commissioner cross-moved for judgment on the pleadings and submitted a memorandum in support of her cross-motion on August 1, 2018 ("Def. Mem."). Dkt. Nos. 19–20. Morales replied on August 9, 2018 ("Pl. Reply."). Dkt. No. 21.

## B.     The Administrative Record

### 1.     Morales' Background

Morales, born in 1968, was 35 years old when he first filed his application for benefits on August 22, 2003, alleging a disability onset date of January 1, 2002. AR at 61. He is now 50 years old. His disability claim stems from a car crash.[1] In June 1999, while working as a limousine driver, Morales was in an accident that injured his back, neck, left shoulder, and both knees. *Id.* at 194. Prior to the accident, Morales had also worked as a cook, a graphic artist, a housekeeper, a mailroom employee at a record company, a supermarket worker, and in sales at a record distribution company. *Id.* at 120–21. Morales completed high school and two years of college. *Id.* at 124. He attended a computer training course and received his certificate in June 2002. *Id.*

Since the onset of his disability, Morales has not engaged in sustained full-time employment, though he has held a few jobs over the last 15 years. Shortly after his accident, he attempted to work as a limousine driver again for a month, but could not continue "because it was just too overbearing for [him]." *Id.* at

---

[1] At two points in the administrative record, physicians stated that Morales was injured in 1999 while commuting on the New York City subway rather than in a car crash. AR at 791, 869.

613–14. He also worked for a few months as a doorman. *Id.* at 613. Morales also earned some income from recording work that he did from his own home, including editing, mixing, and composing. *Id.* at 418–19. In 2014, Morales, with a business partner, started a business called Emence Records, which manufactured and distributed music products. *Id.* at 685, 1005–06.[2] In recent years, however, he did not work regularly with Emence because he could not "focus like [he] used to." *Id.* at 1006.

Also in 2014, Morales, with two business partners, started an ambulette service for non-emergency medical transportation. *Id.* at 1002. The company, Cloud Med Transport, LLC, mostly derived its income from organizing drivers for its sole client, Maximum Orthopedics Clinic. *Id.* at 1007. Morales contacted the drivers for the service; based on his testimony, this role ended in November 2016. *Id.* at 1008. Currently, the company owns two transportation vans that are not operational for insurance reasons. *Id.* at 1003. Morales testified that he did not receive any income from this company. *Id.* at 1007. In a letter to ALJ Dorf submitted after the 2017 hearing, Morales' counsel stated that Morales and his partners were changing their business model, which Morales expected "will make the operation truly profitable because they will be able to secure much better contracts from health care institutions." *Id.* at 917.

---

[2] Based on a passage from ALJ Dorf's 2014 decision, Morales appears to have discussed his work with Emence Records in greater detail at the 2014 hearing. AR at 685. But because the 2014 hearing tape was lost, the record is not fully developed as to Morales' role in that company.

Morales has lived in the same apartment in Manhattan since his initial application for benefits in 2003. *Id.* at 46, 1000–01. He lives on the fifth floor of a walk-up building. *Id.* at 641. In January 2014, Morales stated in a psychiatric evaluation that he lived with his wife and their then-two-year-old son; he also had custody of his then-19-year-old daughter from another marriage and his wife's then-12-year-old son. *Id.* at 802. Morales first met his wife in 2005 or 2006 during a business trip to the Dominican Republic; he married her in November 2007. *Id.* at 634–35. As of the 2009 ALJ hearing, Morales' wife had not yet moved to the United States for visa reasons (though she has since done so). *Id.* at 634. At the 2009 hearing, Morales stated he would make one to two trips a year to the Dominican Republic to see her for one to two months. *Id.* at 636.

From 1999 to 2009, Morales lived with his father in Manhattan. *Id.* at 634, 637. Because his father was in poor health, Morales cared for him by helping him bathe and put on his clothes. *Id.* at 640. Morales wrote in a 2003 New York State Disability Determination Function Report that his daughter would stay with him for two weeks out of each month. *Id.* at 137. He would cook for her, walk her to the school bus stop two blocks away, and take the bus to pick her up in the afternoon. *Id.*

Morales has taken many medications since his initial injuries, including Relafen, Percocet, and Naprosyn for pain management. *Id.* at 426, 622, 628. But he has stated that he is "trying not to take too many medications." *Id.* at 628. Morales has attended physical therapy sessions and did the prescribed exercises at home.

*Id.* at 427–28. Morales can use public transportation to travel alone, though he testified in 2009 that he could not use it every day. *Id.* at 642, 1010. In the past, Morales prepared his own meals and washed his own clothes, doing everything in "little portions." *Id.* at 637. Currently, his wife helps him with household chores. *Id.* at 805. Morales is able to dress, bathe, and groom himself, though his wife helps him with anything that requires him to bend down. *Id.*

## 2.  Relevant Medical Evidence in the Record

### a.  Treatment by Drs. Sosina and Cabatu

Between June 1999 and March 2004, Drs. Klara Sosina and Orsuville Cabatu, specialists in physical medicine and rehabilitation, treated Morales for his shoulder, knee, neck, and back injuries. AR at 157–202, 206–17, 315–79. Dr. Sosina saw Morales between June 1999 and December 2002, at least 23 times; Dr. Cabatu saw Morales between March 2003 and March 2004, at least nine times. *Id.* At Dr. Sosina's last session with Morales on December 30, 2002, she determined that his lumbar strain had resolved, and he had full motion of his left shoulder following surgery he had undergone in August 2002. *Id.* at 157. She stated: "Patient may return to work full duty as computer technician." *Id.*

In March 2003, however, her colleague Dr. Cabatu determined Morales "continues to be partially disabled from duty." *Id.* at 352. On April 29, 2003, Morales reported decreased neck, back, shoulder, and knee pain that was nevertheless "still painful," and reported that physical therapy helped. *Id.* at 353. Dr. Cabatu continued to identify Morales as "partially disabled from duty" until a

November 4, 2003 session when Morales reported that he had strained his back picking up a blanket on October 17, 2003. *Id.* at 361. At that time, Dr. Cabatu opined: "Patient continues to be totally disabled from duty." *Id.* at 362. After sessions the following December and February, Dr. Cabatu found that Morales continued to be totally disabled. *Id.* at 363–66. In Dr. Cabatu's final session with Morales on March 3, 2004, he observed that Morales had back pain, occasional pain in both thighs, and decreased left knee pain. He stated: "Patient goes to NY Sports Club (gym)," and "has missed therapy for 4 weeks." *Id.* at 368. He concluded the final session by finding that Morales continued to be "partially disabled from duty." *Id.* at 369.

### b.    Treatment by Dr. Mian

Between January 2001 and October 2003, Dr. Shahid Mian, an orthopedic surgeon at Cabrini Medical Center, treated Morales for his shoulder, knees, back, and neck injuries. *Id.* at 226–305. Dr. Mian saw Morales at least 14 times. *Id.* On January 25, 2001, Dr. Mian diagnosed him with herniation of the 6-7 disc, bulging C2 through C6 discs, low back syndrome, and tears of the left shoulder rotator cuffs and medial meniscus of both knees. *Id.* at 273. On October 28, 2003, following an incident at home where Morales strained his back, Dr. Mian diagnosed Morales with acute exacerbation of low back syndrome. *Id.* at 290. On that date, Dr. Mian also requested an MRI of the lumbrosacral spine. *Id.* at 291. Dr. Mian also operated on Morales twice — surgery on Morales' left shoulder on August 21, 2002 and on Morales' left knee on October 29, 2003. *Id.* at 294, 298.

### c. Treatment by Dr. Gotlieb

Between July 2004 and October 2006, Dr. David Gotlieb, an internist at Lenox Hill Hospital, treated Morales as his primary care physician. *Id.* at 569–605.[3] Dr. Gotlieb saw Morales at least 11 times. *Id.* On his first visit on July 8, 2004, Morales informed Dr. Gotlieb that two weeks previously, he had yawned and felt a pain on the left side of his neck. He had difficulty moving but no sensory loss. *Id.* at 573. Dr. Gotlieb considered prescribing medication (but did not prescribe it at the time), considered ordering an MRI, and stated Morales should return in two weeks if he did not improve. *Id.* at 574.

On December 20, 2004, Morales returned to Lenox Hill Hospital where he was seen by a different doctor, Dr. Ladan Ahmadi.[4] *Id.* at 576. Dr. Ahmadi recorded that Morales reported "numbing pain, now radiating on [average] 8/10 intensity. Can sit for only 1–2 [hours] before feeling pain. . . . Worse bending or picking things up." *Id.* at 576. Also on December 20, 2004, Morales received a lumbar spine x-ray; the technician opined that the results showed a normal study. *Id.* at 578. On January 10, 2005, Dr. Gotlieb noted that Morales had lower back weakness and pain after he lifted a quilt, which had resulted in an emergency room

---

[3] With several of the records from Lenox Hill Hospital, it is unclear who was the attending physician. Many of the notes were not signed, and had varying types of handwriting.

[4] The record is not clear as to the actual date of this visit. The date indicated is followed by a question mark (12/20?). AR at 576.

visit the previous November. *Id.* at 581.[5] On July 12, 2005, Morales reported that he had lower back pain with a pain level of seven out of ten without medication, and denied having lower extremity numbness or tingling. *Id.* at 583.

On December 8, 2005, Dr. Gotlieb provided a medical opinion to the SSA. In his report, he stated that he "cannot determine at present" the prognosis for Morales. *Id.* at 381. He opined that Morales could sit up to half an hour continuously and for four hours total in a workday, stand up to one hour continuously and for one hour total in a workday, and walk up to three blocks continuously and three blocks total in a workday. *Id.* at 382. He further opined that Morales could not use his hands for simple grasping, pushing, pulling, or fine manipulation, and that Morales could not physically travel on a daily basis. *Id.* at 383–84.

On March 6, 2006, Dr. Gotlieb noted that Morales' back pain was well controlled. *Id.* at 593. On May 30, 2006, Morales reported that his back pain was "still not controlled with Naproxen," but felt that physical therapy helped. *Id.* at 596–97. On June 26, 2006, Dr. Gotlieb noted that Morales' lower back pain was better controlled on Motrin/Ultram, that his MRI showed signs of S1 nerve compression, and that he was not a candidate for surgery. *Id.* at 597, 599. On July 26, 2006, Morales reported that physical therapy helped him with his pain, and he wanted more physical therapy sessions. *Id.* at 602. On Morales' last visit on

---

[5] This seems to be a separate incident from October 2003 when Morales reported to Dr. Cabatu and Dr. Mian that he had hurt his back lifting a blanket and had to visit the emergency room. AR at 290, 361.

October 31, 2006, Dr. Gotlieb noted that Morales "had very good pain control and physical therapy." *Id.* at 604.

### d.    Treatment by Dr. Palmeri

Between May 2005 and August 2006, Dr. Michael Palmeri, an orthopedic surgeon, treated Morales at least eight times. *Id.* at 521–48. In his first exam on May 17, 2005, Dr. Palmeri found Morales suffered from "continued cervical strain with radiculopathy, continued weakness in the left shoulder, lumbosacral strain with radiculopathy, patellofemoral syndrome involving the left knee and right knee contusion." *Id.* at 526. Dr. Palmeri opined that Morales "can work in a limited capacity." *Id.*

On January 18, 2006, Morales received a lumbar spine MRI. *Id.* at 591. The result showed mild disc bulging with mild spinal canal stenosis at L4 through L5 and L5 through S1, a small superimposed left-sided disc herniation at L5 through S1 with mild thecal sac and left S1 nerve root compression, and a small foraminal disc herniation without nerve root compression at L4 through L5. *Id.* at 591–92. On March 21, 2006, Dr. Palmeri opined that Morales could continue to work in a limited capacity. *Id.* at 541.

On July 12, 2006, Dr. Palmeri provided a medical opinion to the SSA. In his report, Dr. Palmeri stated: "Patient needs further testing such as EMG/NCV study to further diagnose treatment" and "Patient must rest in between after 1–2 hours of standing/walking." *Id.* at 398–99. Dr. Palmeri's prognosis was "guarded, at this time." *Id.* at 399. Dr. Palmeri did not fully complete the section describing the

day-to-day activities that Morales could undertake on a sustained basis. He merely stated that Morales could sit up to two hours continuously, stand between one to hours continuously, and walk between one to two hours continuously. *Id.* at 400. He did not state how many hours in total Morales could do these activities in a workday. *Id.* Dr. Palmeri observed that Morales was not physically able to travel on a daily basis because he has "trouble stair climbing, walking, and standing for prolonged periods." *Id.* at 402. He noted that Morales refused authorization for a nerve conduction test and epidural lumbar injections. *Id.*

During his final session with Morales on August 15, 2006, Dr. Palmeri stated that "he is still having continued pain with radiations down his legs. He has had some relief with a course of Naprosyn and Ultram. He is working in a sedentary capacity." *Id.* at 546.

### e. Treatment by Drs. Boppana and Kaplan

Between November 2006 and November 2008, Dr. Madhu Boppana, a neurologist at NY Ortho, Sports Medicine & Trauma, P.C., saw Morales at least 10 times. *Id.* at 549–69.[6] At his first session on November 16, 2006, Dr. Boppana found that Morales' symptoms were consistent with lumbosacral radiculopathy and cervical radiculopathy, and prescribed Percocet for pain management. *Id.* at 550. On November 30, 2006, Morales reported that he experienced significant improvement but remained in pain. *Id.* at 552. On December 19, 2006, Morales

---

[6] Plaintiff's counsel states that Morales saw Dr. Boppana through the time of the hearing in March 2009. Pl. Mem. at 6. However, the administrative record only contains notes from visits to Dr. Boppana through November 19, 2008. AR at 566.

reported symptoms of an "acute thoracic and lumbosacral spasm" over the weekend, which nearly brought him to the emergency room. *Id.* at 553. Dr. Boppana's examination revealed "thoracic and lumbosacral paraspinal level spasm at T2 through C8 and L2, L3, L4, L5, and S1, that is quite prominent restriction of lumbar extension and flexion and thoracic rotation and thoracic flexion." *Id.* at 553. On January 31, 2007, Morales reported that "his back is killing him." As a result, Dr. Boppana renewed his prescription of Percocet. *Id.* at 554. After an electrodiagnostic report taken on March 30, 2007, Dr. Boppana concluded Morales' exam results were consistent with a bilateral multi-levels lumbar radiculopathy. *Id.* at 556. Morales saw Dr. Boppana again on July 9, 2007 and then on March 19, 2008. *Id.* at 560, 561. In March 2008, Dr. Boppana reported that Morales had chronic severe back pain that responded to medications and renewed Morales' medications. *Id.* at 561.

On September 29, 2008, Morales reported that he had persistent back pain radiating into both legs, neck pain and stiffness, and left shoulder pain. *Id.* at 563. He had reinjured his left shoulder in a recent incident, but did not want to see his prior orthopedic surgeon, Dr. Palmeri. *Id.* Accordingly, Dr. Boppana referred him to Dr. Jeffrey Kaplan in the same office. *Id.* On October 15, 2008, Dr. Boppana wrote a letter "To Whom It May Concern," finding that Morales "is totally disabled and unable to work at this time." *Id.* at 568. On the final recorded visit to Dr. Boppana on November 19, 2008, Morales reported no change in signs or symptoms, and Dr. Boppana renewed his medications. *Id.* at 566.

On referral from Dr. Boppana, Morales saw Dr. Kaplan, an orthopedic surgeon, on October 15, 2008 and December 8, 2008. *Id.* at 564. Dr. Kaplan treated Morales primarily for a shoulder problem after Morales reinjured it doing gentle exercises. *Id.* Dr. Kaplan noted that x-rays showed an abnormal orientation to the AC joint, but Dr. Kaplan believed "this [was] just a variant of normal." *Id.* Dr. Kaplan gave Morales an injection in the left shoulder, a prescription for Flector patches, and directed him to continue with Percocet as needed. *Id.*

### f. Treatment from Dr. Bioh

Between November 2011 and September 2015, Dr. Dominick Bioh, an internist, treated Morales at least 11 times as his primary care physician. *Id.* at 879–84, 978–88, 1001.[7] On November 17, 2011, Morales reported his lower back pain had worsened over the last several months; Dr. Bioh diagnosed Morales with lower back pain and muscle spasms. *Id.* at 978. On January 31, 2012, after reviewing Morales' lumbar MRI, Dr. Bioh prescribed medications. *Id.* at 979. Nearly a year later, on December 13, 2012, Morales reported he had intermittent lower back pain symptoms, and had difficulty with adult daily living activities "at times." *Id.* at 980. On April 3, 2013, Morales reported that physical therapy was mildly helpful but he was unable to go to all sessions every week, and that he used his pain medication intermittently as he was afraid of addiction. *Id.* at 982. On July 31, 2013, Morales reported no clear pattern to his pain: "one day tolerable, next

---

[7] Plaintiff's counsel states that Morales saw Dr. Bioh through the date of the hearing in March 2017. Pl. Mem. at 7. However, the administrative record only contains notes from visits to Dr. Bioh through September 16, 2015. AR at 988.

day, unable to walk around 10 feet without severe pain." *Id.* at 983. He added that the pain was partially relieved with medications. *Id.* On January 24, 2014, Morales reported he had difficulty with activities of daily life, was unable to sleep, stand, or ambulate for significant periods of time, took Percocet intermittently, and still participated in physical therapy. *Id.* at 987. On September 16, 2015, Morales reported increased stress due to his housing situation, admitted to cocaine use for pain relief, reported no injuries or trauma since his last visit, and reported that his pain level varied from three to eight out of ten. *Id.* at 988.

On January 27, 2014, Dr. Bioh provided a medical opinion to the SSA. *Id.* at 816–20. Dr. Bioh noted that Morales had chronic pain symptoms both at rest and with ambulation for the past 15 years. *Id.* at 816. His prognosis was "guarded." *Id.* at 817. He opined that Morales could sit up to 15 to 30 minutes continuously and up to a total of three hours a day, could stand up to 10 minutes continuously and for a total of 60 minutes a day, and could walk up to five minutes continuously and for a total of 45 minutes a day. *Id.* at 818. Dr. Bioh also found that Morales could occasionally bend and reach, and could do simple grasping and fine manipulation with both hands. *Id.* at 818–19. He also opined that Morales could physically travel on a daily basis by both bus and subway. *Id.* at 820.

On June 28, 2016, Dr. Bioh diagnosed Morales with unspecified asthma, cervicalgia, radiculopathy of the cervical region, and other intervertebral disc displacement in the lumbosacral region. *Id.* at 881. This examination was on referral from an examination on June 26, 2016 by Tyrrell Carbury, a drug abuse

counselor.  *Id.* at 885, 890, 906.  In that examination, Morales reported he had taken both cocaine (since age 17) and cannabis (since age 13).  *Id.* at 885.  Carbury noted that Morales had a high school level education, a technical skill, and "runs his own ambulette service."  *Id.* at 894.  Morales "shared that he does not want to work on this life area [education or vocational opportunities] and he does not see the need to."  *Id.*  Morales reported that it was "very easy" to use a washing machine and dryer and take care of his personal hygiene, and did not need to improve on any of his "adult daily living skills."  *Id.* at 895.  He also reported that, for fun or relaxation, he liked to take his children to the park.  *Id.*

### g.    Treatment by Dr. Kohler

Between July 2016 and November 2016, Dr. Matthew Kohler, an anesthesiologist and pain specialist at Hudson Spine & Pain Medicine Clinic, saw Morales at least seven times for his low back pain and neck pain.  *Id.* at 864–68.  In the initial consultation on July 5, 2016, Morales reported that the pain started "several years ago, without any precipitating event, and has been worsening recently."  *Id.* at 864.  He reported that the pain interfered with sitting, standing, walking, and standing from a seated position.  *Id.*  Dr. Kohler performed procedures such as trigger point injections; they helped temporarily, but the pain returned.  *Id.*  Over the next several months, Morales continued to visit Dr. Kohler, reporting pain in his lower back that radiated down to his feet.  *Id.* at 864–65.  On August 12, 2016, Morales also reported intermittent neck pain "that [was] recurring more frequently recently."  *Id.* at 864.  On October 10, 2016, Morales reported that his

neck pain caused migraines and reported his pain as 10 out of 10. *Id.* at 865. Dr. Kohler opined that Morales had several ailments, including radiculopathy of the cervical region and radiculopathy of the lumbar region. *Id.* at 866-867. Morales also received two MRIs during this period: a lumbar spine MRI on July 29, 2016 and a cervical spine MRI on August 30, 2016. *Id.* at 869, 871.

### h.   Examination by Dr. Woods

Dr. Ted Woods, a preventive medicine doctor, conducted an orthopedic examination of Morales on January 17, 2014 at ALJ Dorf's request. *Id.* at 791–800. Dr. Woods opined that Morales' cane use was "not medically necessary," his gait was steady, and his station was normal. *Id.* at 792. He stated that Morales needed no help changing for the exam or getting on or off the exam table. *Id.* He opined that Morales had a mild to moderate limitation for bending, lifting, carrying heavy objects, and prolonged sitting. *Id.* at 793. He opined that Morales could occasionally lift and carry up to 50 pounds, sit 30 minutes, stand two hours, and walk two hours continuously, and sit four hours, stand eight hours, and walk eight hours total in a workday. *Id.* at 795–96.

### i.   Medical Opinion of Dr. Palvia

Dr. Tanuj Palvia, a colleague of Dr. Kohler at Hudson Spine & Pain Medicine Clinic, submitted a medical statement to the SSA on December 6, 2016 that stated Morales had both lumbar and cervical radiculopathy confirmed by MRIs. *Id.* at 905. Dr. Palvia opined:

> [T]he chronic lower back pain and neck pain Morales
> describes seriously interfere with his ability to sit, stand,

or walk for prolonged periods of time. . . . Basically, Mr.
Morales is not someone who is going to be able to work a
normal 7 to 8 hours work day.  Although he is capable of
some part-time work activity, he will not be able to do so
on a reliable and predictable schedule. . . . In sum, the
symptoms Mr. Morales describes are, in my opinion,
completely consistent with his MRIs and general clinical
presentation.

*Id.*[8]

### j.     Medical Opinion of Dr. Hansen

At the ALJ hearing on March 29, 2017, Dr. Jeffrey Hansen testified by phone

from Montana.  *Id.* at 993.  Dr. Hansen is a board-certified orthopedic surgeon who

was retained by ALJ Dorf.  *Id.* at 1014.  Dr. Hansen testified that Morales had:

[D]egenerative disc disease of the cervical spine, with
radiculopathy of the C5 nerve root.  He has degenerative
disc disease of the lumbar spine.  It's an S1 nerve root
abnormality.  It must have been present . . . [throughout]
that whole timeframe, but it had certainly worsened
. . . [over] the last few years with some of the more recent
imaging confirming all that. . . . And then in 2007, he had
some lumbar EMGs . . . that describes some lumbar
radiculopathy, so, he basically has had ongoing cervical
and lumbar degenerative disc disease, neuroforaminal
narrowing from arthritis and nerve root abnormalities.
That really hasn't changed.

*Id.* at 1014–15.  Dr. Hansen opined that, based on the record, Morales' condition

qualified as an impairment under SSA guidelines, and at least equaled Listings

1.04A (disorder of the spine) and 1.02A (major dysfunction of a joint) from 2002 to

the present day.  *Id.* at 1018.  At the beginning of Dr. Hansen's testimony, ALJ Dorf

noted that "[t]here appear to be no records, or very few records, between 2003 and

---

[8] The record does not include any treatment notes from Dr. Palvia.

2014," and Dr. Hansen agreed. *Id* at 1013.[9]  With regard to Listing 1.04A, Dr.

Hansen mentioned that "[t]here is, kind of, falsity . . . in the record – in . . . [the]

2004 to 2012 timeframe, but . . . there are some indication of things – basically on

point." *Id*. at 1015.  With regard to Listing 1.02A (left hip), Dr. Hansen mentioned

that "[t]he exam isn't real thorough that Dr. Kohler did, but it does show pain with

internal rotation attempts, and so that to me means that hip is arthritic," and "I'm a

little less certain about the progression of that condition [left hip joint], but it, you

know, hip arthritis develops over a long period of time. . . ." *Id*. at 1016, 1018.  Dr.

Hansen concluded that Morales' impairments equaled two listings (and thus

Morales is per se disabled). *Id*. at 1018.

---

[9] It is not clear from his testimony which medical records were in the file that Dr. Hansen reviewed.  At the beginning of the hearing, ALJ Dorf stated the following records were in the file: 1. "The first filings related to the initial claim that was decided by Judge Garrety," 2. "The 2006 report of Dr. [Robbins]," 3. "The report of Dr. Kohler dated November 14, 2016," 4. "The report of Dr. Palvia," 5. "The report of Dr. [Bioh] [that] . . . indicates that the Claimant, quote, runs his own ambulette service, unquote, and was arrested for possession of narcotics and is on probation through the Criminal Court. . .," 6. "The report of Dr. Woods," 7. "The psychiatric report of MSW Gordon Whitaker," and 8. "[T]he Remand Orders."  AR at 994–97. Plaintiff's counsel responded that several files were missing from the record: 1. "[T]reatment records from Dr. [Bioh]," and 2. "[E]xtensive psychiatric treatment records from the Karen Horney Clinic." *Id*. at 997.  The record is not clear if portions of Dr. Gotlieb's and Dr. Palmeri's notes (those taken after the 2006 hearing), or Dr. Boppana's notes from November 2006 through November 2008 were in the record reviewed by Dr. Hansen.

### 3.  ALJ Hearings

### a.  Morales' Testimony

### i.  October 4, 2005 Hearing

During his first hearing in October 2005, Morales testified that his main health problems were "uncomfort and pain for my lower back to my mid and my upper area" that he experienced every day. *Id.* at 421.  He testified that medications brought down the pain, but they made him "queasy." *Id.* at 422. Sitting or standing for too long made the back pain worse; he could walk only at a normal pace. *Id.*  He could sit 15 to 20 minutes in reasonable comfort, and could stand half an hour to 45 minutes. *Id.* at 422–23.  He would lay down approximately three to four times a day for five to ten minutes. *Id.* at 424.  He could lift a gallon of milk from the counter. *Id.* at 423.  Morales testified his middle back would act out sporadically, and he experienced "shooting pain." *Id.* at 424–25.  He testified that after surgery in 2003, his left shoulder felt better, stating that "[he] can reach for items, [he] can go over [his] head like this, [he] couldn't do none of that before." *Id.* at 425.  Morales testified that he had full use of his shoulder, but it was not as strong as before. *Id.*  He also had issues with both his knees.  He had surgery on his left knee, but "it was too painful," so he "chickened out on the other knee." *Id.* at 426.  During the day, his knee ached, especially when it was cold. *Id.*  He took Relafen for the pain, did physical therapy exercises provided by his therapist every day, and used an "electro stimulant" device on his back. *Id.* at 426–27.  Morales testified that he attended a course for computer technical support in 2000; he

obtained his certificate in three years rather than a year and a half because he "kept missing days." *Id.* at 428–29.

### ii. March 23, 2009 Hearing

During his second hearing in March 2009, Morales testified that he worked as a doorman for a few months after his car accident. *Id.* at 613. Morales also testified that he worked at a car service for a few months while waiting for workers' compensation after his accident. *Id.* at 614.[10] His job required him to pick up passengers, sometimes with luggage, and take them to the airport, or pick up passengers from work to bring them home; he would work around 10 hours a day. *Id.* at 613–14. He stated: "I was pretty much forcing myself to do it although I had the pains and stuff. But I couldn't continue because it was just too overbearing for me." *Id.* at 614. Morales testified that after his accident he also "tr[ied] to survive with a little bit of recording sessions" which he offered at his home. *Id.* at 620. Morales testified to at least a few occasions where his pain and inflammation kept him from working — once as a DJ at a club for two hours and for recording jobs that would take multiple continuous hours to complete. *Id.* at 621.

Morales testified that he experienced back pains, heaviness "on the legs," and chronic headaches. *Id.* at 622. He sometimes could not walk because of the pain. *Id.* His right leg improved after a neural injection in 2007, but he still experienced numbness and dullness in his left leg. *Id.* at 623. He also testified that his neck

---

[10] While the hearing transcript does not contain exact dates for the doorman or car service jobs, they both occurred a few years after his accident in 1999.

pain would keep him from sitting in front of a desk and looking down for more than five minutes. *Id.* at 626. This symptom lasted from 1999 to 2007, at which point it "got better." *Id.* at 627. Morales attributed the recovery to "other medicine that [he'd] been [taking], the stretching, the breathing and also the eating, not eating junk food, like just eating good food from vegetables to fish and stuff like that." *Id.* Morales testified that he could sit 20 to 30 minutes in reasonable comfort, and could walk two blocks without having to stop and rest. *Id.* at 631. Morales testified that he used a cane that a doctor had prescribed "a long time ago." *Id.* at 632. He also testified that he typically laid down twice a day for an hour each to relieve tension in his back. *Id.* at 639.

At the hearing, plaintiff's counsel contended that Morales' impairments met or equaled Listing 1.04, based on testimony from his doctors. *Id.* at 650–51. ALJ Levin responded that because the record covered seven years, one "might" be able to add together multiple symptoms and treating notes from multiple doctors to equal a listing. *Id.* at 651. But he expressed skepticism that, in Morales' case, even with a long record, he exhibited "enough of the items . . . to make a listing." *Id.*

### iii.    March 29, 2017 Hearing

As previously mentioned, the tape from the February 28, 2014 hearing before ALJ Dorf was certified as lost, so there is no record of Morales' 2014 testimony. *Id.* at 663. In 2017, Morales again appeared before ALJ Dorf for a fourth hearing. ALJ Dorf questioned Morales about his two businesses, Cloud Med and Emence Records. *Id.* at 1002–09. Morales testified that he was unable to do sedentary work because

"[he gets] the pain on [his] neck and it goes into [his] head. It feels like [he has] a rock on [his] head, very uncomfortable." *Id.* at 1009. Morales then testified that he sometimes used a cane; he was able to use public transportation; and, while he walked one-and-a-half blocks to work about once or twice a month, he was unable to walk five blocks on a regular basis. *Id.* at 1010. ALJ Dorf also questioned Morales about his conviction for drug possession in 2016. *Id.* at 1012–13. Morales testified that he used cocaine and alcohol to relieve pain. *Id.* at 1013. ALJ Dorf then raised the issue of substantial gainful activity. *Id.* at 1019. He stated that it would be helpful to know what income Morales received from his work with his business operations. *Id.* Plaintiff's counsel stated he would obtain "whatever there is." *Id.*

### b. Vocational Expert's Testimony - March 23, 2009

Vocational expert Andrew Pasternak provided testimony at the 2009 hearing. ALJ Levin asked Pasternak to consider jobs for:

> a person the claimant's age, education and prior work experience who is capable of sedentary exertion. . . sitting up to six hours of a workday total with the usual breaks, standing and/or walking up to two hours or a workday with breaks . . . lifting and carrying not to exceed 10 pounds. . . . [The] work tasks would have to be simple, routine and repetitive.

*Id.* at 649. Pasternak provided options including an order clerk (4,500 locally), assembly jobs (5,000 locally), and machine tender jobs (4,900 locally). *Id.* at 649–50. Pasternak's testimony is the only vocational testimony available in the record.[11]

---

[11] Vocational expert Christine DiTrinco was present at the 2017 hearing but did not testify. AR at 993. According to the 2014 ALJ Decision, Yaakov Taitz, Ph.D.

## II.    DISCUSSION

**A.    Standard of Review**

### 1.    Judicial Review of Commissioner's Determination

An individual may obtain judicial review of a final decision of the Commissioner in the "district court of the United States for the judicial district in which the plaintiff resides." 42 U.S.C. § 405(g). The district court must determine whether the Commissioner's final decision applied the correct legal standards and whether it is supported by substantial evidence. *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (internal quotation marks and alterations omitted).

The substantial evidence standard is a "very deferential standard of review." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012). The reviewing court "must be careful not to substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review." *DeJesus v. Astrue*, 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)) (internal quotation marks and alterations omitted). "[O]nce an ALJ finds facts, [a court] can reject those facts 'only if a

---

testified as a vocational expert at the 2014 hearing, but that testimony has been lost. *Id.* at 667.

reasonable factfinder would have to conclude otherwise.'" *Brault,* 683 F.3d at 448

(quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

In weighing whether substantial evidence exists to support the

Commissioner's decision, "the reviewing court is required to examine the entire

record, including contradictory evidence and evidence from which conflicting

inferences can be drawn." *Selian*, 708 F.3d at 417 (quoting *Mongeur v. Heckler*, 722

F.2d 1033, 1038 (2d Cir. 1983)). On the basis of this review, the court may "enter,

upon the pleadings and transcript of the record, a judgment affirming, modifying, or

reversing the decision of the Commissioner of Social Security, with or without

remanding . . . for a rehearing." 42 U.S.C. § 405(g).

In certain circumstances, the court may remand a case solely for the

calculation of benefits, rather than for further administrative proceedings. "In . . .

situations[ ] where this Court has had no apparent basis to conclude that a more

complete record might support the Commissioner's decision, [the court has] opted

simply to remand for a calculation of benefits." *Michaels v. Colvin,* 621 F. App'x 35,

38–39 (2d Cir. 2015) (quoting *Rosa v. Callahan,* 168 F.3d 72, 83 (2d Cir. 1999))

(internal quotation marks omitted). The court may remand solely for the

calculation of benefits when "the records provide[ ] persuasive evidence of total

disability that render[s] any further proceedings pointless." *Williams v. Apfel,* 204

F.3d 48, 50 (2d Cir. 1999). However, "[w]hen there are gaps in the administrative

record or the ALJ has applied an improper legal standard, [the court has], on

numerous occasions, remanded to the [Commissioner] for further development of

the evidence." *Pratts v. Chater,* 94 F.3d 34, 39 (2d Cir. 1996) (quoting *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)) (alteration in original).

## 2. Commissioner's Determination of Disability

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A). Physical or mental impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In assessing a claimant's impairments and determining whether they meet the statutory definition of disability, the Commissioner "must make a thorough inquiry into the claimant's condition and must be mindful that 'the Social Security Act is a remedial statute, to be broadly construed and liberally applied.'" *Mongeur*, 722 F.2d at 1037 (quoting *Gold v. Sec'y of H.E.W.*, 463 F.2d 38, 41 (2d Cir. 1972)). Specifically, the Commissioner's decision must take into account factors such as: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Id.* (citations omitted).

### a.     Five-Step Inquiry

The Commissioner's determination of disability follows a sequential, five-step

inquiry. *Cichocki v. Astrue*, 729 F.3d 172, 173 n.1 (2d Cir. 2013); 20 C.F.R.

§ 404.1520.[12]  First, the Commissioner must establish whether the claimant is

presently employed.  20 C.F.R. § 404.1520(a)(4)(i).  If the claimant is unemployed, at

the second step the Commissioner determines whether the claimant has a "severe"

impairment restricting his ability to work.  20 C.F.R. § 404.1520(a)(4)(ii).  If the

claimant has such an impairment, the Commissioner moves to the third step and

considers whether the medical severity of the impairment "meets or equals" a

listing in Appendix 1 of Subpart P of the regulations.  20 C.F.R. § 404.1520(a)(4)(iii).

If so, the claimant is considered disabled.  *Id.*; 20 C.F.R. § 404.1520(d).  If not, the

Commissioner continues to the fourth step and determines whether the claimant

has the residual functional capacity ("RFC") to perform his or her past relevant

work.  20 C.F.R. § 404.1520(a)(4)(iv).  Finally, if the claimant does not have the RFC

to perform past relevant work, the Commissioner completes the fifth step and

---

[12] In 2017, new SSA regulations came into effect.  The newest regulations apply
only to claims filed with the SSA on or after March 27, 2017.  Accordingly, because
Morales' claims were filed in 2003, the Court applies the regulations that were in
effect when Morales' claims were filed.  *See, e.g.*, *Rousey v. Comm'r of Soc. Sec.*,
16-CV-9500 (HBP), 2018 WL 377364, at *8 n.8 & *12 n.10 (S.D.N.Y. Jan. 11, 2018)
(noting 2017 amendments to regulations but reviewing ALJ's decision under prior
versions); *O'Connor v. Berryhill*, 14-CV-1101 (AVC), 2017 WL 4387366, at *17 n.38
(D. Conn. Sept. 29, 2017) (same); *Luciano-Norman v. Comm'r of Soc. Sec.*,
16-CV-1455 (GTS) (WBC), 2017 WL 4861491, at *3 n.2 (N.D.N.Y. Sept. 11, 2017)
(same), *adopted by*, 2017 WL 4857580 (N.D.N.Y. Oct. 25, 2017); *Barca v. Comm'r of
Soc. Sec.*, 16-CV-187, 2017 WL 3396416, at *8 n.5 (D. Vt. Aug. 8, 2017) (same).

ascertains whether the claimant possesses the ability to perform any other work. 20 C.F.R. § 404.1520(a)(4)(v).

The claimant has the burden at the first four steps. *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008). If the claimant is successful, the burden shifts to the Commissioner at the fifth and final step, where the Commissioner must establish that the claimant has the ability to perform some work in the national economy. *See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

### b. Duty to Develop the Record

"Social Security proceedings are inquisitorial rather than adversarial." *Sims v. Apfel,* 530 U.S. 103, 110–11 (2000). Consequently, "the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Moran v. Astrue,* 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks omitted). As part of this duty, the ALJ must "investigate the facts and develop the arguments both for and against granting benefits." *Sims*, 530 U.S. at 111. Specifically, under the applicable regulations, the ALJ is required to develop a claimant's complete medical history. *Pratts*, 94 F.3d at 37 (citing 20 C.F.R. §§ 404.1512(d)–(f)). This responsibility "encompasses not only the duty to obtain a claimant's medical records and reports but also the duty to question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity." *Pena v. Astrue*, 07-CV-11099 (GWG), 2008 WL 5111317, at *8 (S.D.N.Y. Dec. 3, 2008) (citations omitted).

Whether the ALJ has satisfied this duty to develop the record is a threshold question. Before determining whether the Commissioner's final decision is supported by substantial evidence under 42 U.S.C. § 405(g), "the court must first be satisfied that the ALJ provided plaintiff with 'a full hearing under the Secretary's regulations' and also fully and completely developed the administrative record." *Scott v. Astrue*, 09-CV-3999 (KAM), 2010 WL 2736879, at *12 (E.D.N.Y. July 9, 2010) (quoting *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)); *see also Rodriguez v. Barnhart*, 02-CV-5782 (FB), 2003 WL 22709204, at *3 (E.D.N.Y. Nov. 7, 2003) ("The responsibility of an ALJ to fully develop the record is a bedrock principle of Social Security law.") (citing *Brown v. Apfel*, 174 F.3d 59 (2d Cir. 1999)). The ALJ must develop the record even where the claimant has legal counsel. *See, e.g.*, *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996). Remand is appropriate where this duty is not discharged. *See, e.g.*, *Moran,* 569 F.3d at 114–15 ("We vacate not because the ALJ's decision was not supported by substantial evidence but because the ALJ should have developed a more comprehensive record before making his decision.").

### c. Substantial Gainful Activity

To qualify for benefits, a claimant must show the "inability to engage in any substantial gainful activity by reason of . . . impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). If a claimant has engaged in substantial gainful activity ("SGA"), he cannot qualify for benefits, no matter his medical condition. *See* 20 C.F.R.

§§ 404.1520(a)(4)(i) and (b).  The regulations define SGA as "work activity that is both substantial and gainful."  20 C.F.R. § 404.1572.  "Substantial work activity" involves "doing significant physical or mental activities."  20 C.F.R. § 404.1572(a).  Even part-time work or work where "you do less, get paid less, or have less responsibility than when you worked before" can qualify as substantial work.  *Id.*  "Gainful work activity" involves work that you do for "pay or profit."  20 C.F.R. § 404.1572(b).  Work will meet this requirement if "it is the kind of work usually done for pay or profit, whether or not a profit is realized."  *Id.*

For employees, work activity is considered SGA if the claimant's earnings exceed the "earning guidelines" in 20 C.F.R. § 404.1574(b).  For self-employed persons, the regulations provide a three-part test; if a claimant satisfies any one of the three tests, his work will be considered SGA.  *See* 20 C.F.R. § 404.1575.  This additional analysis is necessary because income alone:

> . . . is not a reliable factor in determining SGA, since it is influenced not only by the individual's services but also by such things as market conditions, capital investments, the services of other people, and agreements on distribution of profits.  An individual's services may help build up capital assets during a period of development where no profits are evident . . . . Hence, it is necessary to consider the economic value of the individual's services, regardless of whether an immediate income results from such services.

*Titles II & XVI: Determining Whether Work Is Substantial Gainful Activity-Self-Employed Persons*, SSR 83-34, 1983 WL 31256, at *1 (S.S.A. 1983) (hereinafter "SSR 83-34").

"Test One" provides that a claimant is engaged in SGA if he "render[s] services that are significant to the operation of [a] business and received a substantial income from the business." 20 C.F.R. § 404.1575(a)(2)(i). A claimant renders "significant services" in a business with more than one person if he contributes "more than half the total time required for the management of the business, or . . . more than 45 hours a month regardless of the total management time required by the business." 20 C.F.R. § 404.1575(b). A claimant receives "substantial income" when his net income or "countable income" exceeds the earning guidelines in 20 C.F.R. § 404.1574(b), or if his "countable income" is "comparable to what it was before [the claimant] became seriously impaired . . . or . . . to that of unimpaired self-employed persons in [the claimant's] community who are in the same or a similar business[ ] as their means of livelihood." 20 C.F.R. §§ 404.1575(c)(2)(i)–(ii).

"Test Two" provides that a claimant is engaged in SGA if his work activity "in terms of factors such as hours, skills, energy output, efficiency, duties, and responsibilities, is comparable to that of unimpaired individuals in [the claimant's] community who are in the same or similar business as their means of livelihood." 20 C.F.R. § 404.1575(a)(2)(ii).

"Test Three" provides that a claimant is engaged in SGA if his work activity "is clearly worth the amount shown in [the earning guidelines] when considered in terms of its value to the business, or when compared to the salary that an owner

would pay to an employee to do the work [the claimant is] doing." 20 C.F.R. § 404.1575(a)(2)(iii).

With regards to Tests Two and Three, SSR 83-84 states: "An important part of the comparison is the selection of the group of unimpaired persons. . . . Well-established businesses are generally the most reasonable choice for comparison." SSR 83-84 at *9. SSR 83-84 further provides: "Development must be specific. Each work factor . . . must be described in detail, showing its contribution to the business operation. . . . If only a general description is possible or available, any doubt as to the comparability of the factors should be resolved in favor of the impaired individual." *Id.* SSR 83-84 encourages the fact-finder to conduct a "personal interview with an unimpaired self-employed individual from the selected group," if necessary. *Id.* Fact-finders should also make contact with people with "firsthand knowledge of the impaired individual's work situation obtained through actual participation or observation." *Id.* And, if necessary, they should also consider "data supplied by outside authorities (*e.g.* county agents, etc.)" on the comparability or worth of services. *Id.* at *10.

If the fact-finder did not properly develop the record with regards to substantial gainful activity, courts have remanded the case for further proceedings. *See, e.g., Klemens v. Berryhill,* 703 F. App'x 35, 37 (2d Cir. 2017); *DeRienzis v. Heckler,* 748 F.2d 352, 354 (2d Cir. 1984); *Bertram v. Colvin,* 2015 WL 4545770, at *1 (D. Vt. July 27, 2015); *Ellis-Clements v. Comm' of Soc. Sec.,* 2011 WL 2884870, at *9 (D. Vt. July 18, 2011).

### d.    Treating Physician Rule

"Regardless of its source, the ALJ must evaluate every medical opinion in determining whether a claimant is disabled under the [Social Security] Act." *Pena ex rel. E.R. v. Astrue*, 11-CV-1787 (KAM), 2013 WL 1210932, at *14 (E.D.N.Y. Mar. 25, 2013) (citing 20 C.F.R. §§ 404.1527(c), 416.927(d)) (internal quotation marks omitted).  A treating physician's opinion is given controlling weight, provided the opinion as to the nature and severity of an impairment "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2).  The regulations define a treating physician as the claimant's "own physician, psychologist, or other acceptable medical source who provides [the claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]."  20 C.F.R. § 404.1502. Deference to such medical providers is appropriate because they "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical evidence alone or from reports of individual examinations."  20 C.F.R. § 404.1527(c)(2).

A treating physician's opinion is not always controlling.  For example, a legal conclusion "that the claimant is 'disabled' or 'unable to work' is not controlling," because such opinions are reserved for the Commissioner.  *Guzman v. Astrue*, 09-CV-3928 (PKC), 2011 WL 666194, at *10 (S.D.N.Y. Feb. 4, 2011) (citing 20 C.F.R.

§§ 404.1527(e)(1), 416.927(e)(1)); *accord Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir.

1999) ("A treating physician's statement that the claimant is disabled cannot itself

be determinative.").  Additionally, where "the treating physician issued opinions

that [were] not consistent with other substantial evidence in the record, such as the

opinion of other medical experts, the treating physician's opinion is not afforded

controlling weight." *Pena ex rel. E.R.*, 2013 WL 1210932, at *15 (quoting *Halloran

v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)) (internal quotation marks omitted)

(alteration in original); *see also Snell*, 177 F.3d at 133 ("[T]he less consistent [the

treating physician's] opinion is with the record as a whole, the less weight it will be

given.").

Importantly, however, "[t]o the extent that [the] record is unclear, the

Commissioner has an affirmative duty to 'fill any clear gaps in the administrative

record' before rejecting a treating physician's diagnosis." *Selian*, 708 F.3d at 420

(quoting *Burgess*, 537 F.3d at 129); *see Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir.

1998) (discussing ALJ's duty to seek additional information from treating physician

if clinical findings are inadequate).  As a result, "the 'treating physician rule' is

inextricably linked to a broader duty to develop the record.  Proper application of

the rule ensures that the claimant's record is comprehensive, including all relevant

treating physician diagnoses and opinions, and requires the ALJ to explain clearly

how these opinions relate to the final determination." *Lacava v. Astrue*, 11-CV-7727

(WHP) (SN), 2012 WL 6621731, at *13 (S.D.N.Y. Nov. 27, 2012) ("In this Circuit,

the [treating physician] rule is robust."), *adopted by*, 2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012).

To determine how much weight a treating physician's opinion should carry, the ALJ must consider several factors outlined by the Second Circuit:

> (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

*Halloran*, 362 F.3d at 32 (citation omitted); *see* 20 C.F.R. § 404.1527(c)(2). If, based on these considerations, the ALJ declines to give controlling weight to the treating physician's opinion, the ALJ must nonetheless "comprehensively set forth reasons for the weight" ultimately assigned to the treating source. *Halloran*, 362 F.3d at 33; *accord Snell*, 177 F.3d at 133 (responsibility of determining weight to be afforded does not "exempt administrative decisionmakers from their obligation . . . to explain why a treating physician's opinions are not being credited") (referring to *Schaal*, 134 F.3d at 505 and 20 C.F.R. § 404.1527(d)(2)). The regulations require that the SSA "always give good reasons in [its] notice of determination or decision for the weight" given to the treating physician. *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) (alteration in original) (citations omitted). Indeed, "[c]ourts have not hesitate[d] to remand [cases] when the Commissioner has not provided good reasons." *Pena ex rel. E.R.*, 2013 WL 1210932, at *15 (quoting *Halloran*, 362 F.3d at 33) (second and third alteration in original) (internal quotation marks omitted).

### e.    Claimant's Credibility

An ALJ's credibility finding as to the claimant's disability is entitled to deference by a reviewing court. *Osorio v. Barnhart*, 04-CV-7515 (DLC), 2006 WL 1464193, at *6 (S.D.N.Y. May 30, 2006). "[A]s with any finding of fact, '[i]f the Secretary's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints.'" *Id.* (quoting *Aponte v. Sec'y of Health and Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984)). Still, an ALJ's finding of credibility "must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record." *Pena*, 2008 WL 5111317, at *10 (internal quotation marks omitted) (quoting *Williams v. Bowen*, 859 F.2d 255, 260–61 (2d Cir. 1988)). "The ALJ must make this [credibility] determination 'in light of the objective medical evidence and other evidence regarding the true extent of the alleged symptoms.'" *Id.* (quoting *Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984)).

SSA regulations provide that statements of subjective pain and other symptoms alone cannot establish a disability. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(a)). Accordingly, the ALJ must follow a two-step framework for evaluating allegations of pain and other limitations. *Id.* First, the ALJ considers whether the claimant suffers from a "medically determinable impairment that could reasonably be expected to produce" the symptoms alleged. *Id.* (citing 20 C.F.R. § 404.1529(b)). "If the claimant does suffer from such an impairment, at the second step, the ALJ must consider 'the extent to

which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' of record." *Id.* (citing 20 C.F.R. § 404.1529(a)). Among the kinds of evidence that the ALJ must consider (in addition to objective medical evidence) are: (1) a claimant's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (*e.g.*, lying flat on his back, standing for 15 to 20 minutes every hour, or sleeping on a board); and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *Pena*, 2008 WL 5111317, at *11 (citing SSR 96-7p, 1996 WL 374186, at *3 (SSA July 2, 1996)).

## B. The ALJs' Decisions

### 1. ALJ Garrety's January 5, 2006 Decision

On January 5, 2006, ALJ Garrety issued a decision denying Morales' application. At step one of the disability analysis, ALJ Garrety found that Morales had not engaged in SGA since January 1, 2002. AR at 23. She noted: "there is insufficient evidence to determine if the claimant's self-employment has been at substantial gainful activity levels for some months and as this is unclear, the claimant is given the benefit of the doubt that he has not engaged in substantial

gainful work activity. . . ." *Id.* At step two, ALJ Garrety found Morales had the following severe impairments: left shoulder tear and impingement, bulging cervical discs with herniation at C7-T1, possible left C6 nerve root irritation, left knee medial meniscus tear, and possible right knee medial meniscus tear. *Id.* at 24. ALJ Garrety deemed Morales' back issues a non-severe impairment; she found his back pain had a "minimal effect on [Morales'] ability to perform basic work activity . . . and on several occasions such condition exhibited minimal clinical findings and the examining physicians indicated that it was resolved." *Id.* at 25. At step three, ALJ Garrety found Morales' impairments did not meet or medically equal a listed impairment. *Id.*

For step four's residual functional capacity ("RFC") analysis, ALJ Garrety found that Morales retained the capacity to perform a range of light work: lift/carry up to 20 pounds, sit for four hours in an eight-hour workday, stand for one hour in an eight-hour workday, and walk for three hours in an eight-hour workday. *Id.* at 26. To support this finding, ALJ Garrety found that Morales' impairments could reasonably be expected to produce his alleged symptoms; however, she found Morales' statements about the intensity, duration and limiting effects of the symptoms to be not entirely credible. *Id.* She noted that Morales:

> . . . is able to perform personal care, child care, and
> household care tasks. He can prepare meals, wash
> dishes, do laundry, pay bills, use public transportation,
> get his daughter to and from school, go to therapy and
> other appointments, visit relatives, go to church, do audio
> engineering work out of his home, perform physical
> therapy exercises at home for one hour daily, and in

> addition, he was able to complete a computer technician
> support course receiving certification.

*Id.* at 27–28.

ALJ Garrety also found further evidence that Morales' impairments were not work preclusive in the records of his treating and examining physicians. *Id.* at 28–30. She noted that between 2000 and 2003, his physicians often found that he had a full range of motion, normal muscle strength, and normal reflexes. *Id.* at 28–29. She gave considerable, but not substantive, weight to a consultative examination by Dr. Mohammed Khattak, who found Morales' examination to be basically normal. *Id.* at 30.[13] She gave substantial weight to examinations by Dr. Kenneth Falvo, a physician who examined Morales for his worker's compensation case, who opined that Morales was not disabled and was capable of full-time gainful employment. *Id.* at 31. She gave some weight to opinions given by Drs. Klara Sosina and Orsuville Cabatu about Morales' ability to work, but noted that they "appear[ed] to be based on worker's compensation guidelines and rules rather than on [SSA] disability guidelines . . . ." *Id.* at 31. ALJ Garrety gave substantive weight to portions of Dr. Gotlieb's medical report that asserted Morales could occasionally lift/carry up to 20 pounds, could sit four hours in an eight-hour workday, stand one hour in an eight-hour workday, and walk three hours in an eight-hour workday.

---

[13] Sometime after this decision, Dr. Khattak was removed from the New York State Agency panel of physicians eligible to perform consultative examinations in Social Security cases. The Appeals Council directed ALJs not to rely on his opinions or assessments. AR at 473.

*Id.*[14]  She found that Dr. Gotlieb's additional limitations were not supported by the evidence from other treating or examining physicians.  *Id.*

After determining Morales' RFC, ALJ Garrety found Morales was unable to perform any past relevant work.  *Id.* at 32.  Finally, at step five, ALJ Garrety used the Medical-Vocational Rules to find Morales capable of performing at least five separate occupations among the 1,600 unskilled sedentary and light occupations.  *Id.* at 33.  Thus, ALJ Garrety concluded that Morales was not disabled within the meaning of the Social Security Act.  *Id.*

Following Morales' filing of a federal complaint, the parties stipulated to a remand for further administrative proceedings on January 9, 2008.  *Id.* at 472.  The Appeals Council Order remanding the case directed the ALJ to recontact Dr. Gotlieb to obtain more information and to obtain a vocational expert.  *Id.* at 473–74.

### 2.    ALJ Levin's April 9, 2009 Decision

On April 9, 2009, ALJ Levin issued a decision denying Morales' application.  At step one of the analysis, ALJ Levin found that while Morales had worked "on and off" since his onset of disability, he never earned enough for the work to be considered SGA.  *Id.* at 460, 466.  At step two, ALJ Levin found that Morales had "a 'severe' combination of discogenic disease of the cervical and lumbosacral spines; history of symptomatic knee arthritis, now resolved; and a history of left shoulder internal derangement that has partially recurred."  *Id.* at 466.  At step three, he

---

[14] In Dr. Gotlieb's report, it states that Morales is able to walk up to three *blocks* continuously and for a total of three *blocks* in an eight-hour workday, not hours.  AR at 382.

found that the impairments did not meet or medically equal a listed impairment. *Id.*

For step four's RFC analysis, ALJ Levin concluded that Morales had the capacity to sit for six to eight hours in a work day, to stand and/or walk for two hours in a work day, to lift/carry up to 10 pounds, and to be restricted to work activity that is simple, routine, and repetitive. *Id.* at 466. ALJ Levin noted that Dr. Sosina found Morales at various points to be capable of returning to work as a computer technician. *Id.* at 461. He gave little weight to Dr. Gotlieb's medical report, finding that Dr. Gotlieb gave a "parrot-like adoption of claimant's own subjective statements. A doctor's statement of residual functional capacity does not transmute a claimant's subjective statements into medical gospel." *Id.* at 463.[15] He also noted that Dr. Gotlieb was an internist, "with no documented expertise in musculoskeletal conditions." *Id.* ALJ Levin gave slightly more weight to Dr. Palmeri's medical report, but noted that Dr. Palmeri's own medical findings "[did] not provide any basis for a conclusion that claimant could **never** bend, squat, climb or reach, or push/pull arm controls." *Id.* at 464 (emphasis in original). He also

---

[15] Despite the Appeals Council's mandate to obtain further information from Dr. Gotlieb, it appears that ALJ Levin did not have access to many of Dr. Gotlieb's records. He stated that he only saw two records of Morales' visits before Dr. Gotlieb's December 8, 2005 medical report to the SSA — one on July 8, 2004 and one on October 10, 2005. AR at 461. However, the current record before this Court contains four additional visits to Lenox Hill Hospital on December 20, 2004, January 10, 2005, July 13, 2005, and October 10, 2005. *Id.* at 576, 581, 583, 585. At least the December 20, 2004 visit, however, was to a different physician in the hospital, Dr. Ahmadi. *Id.* at 577. The July 13, 2005 visit treatment notes were not signed. The other visits on January 10, 2005 and October 10, 2005 appear to be with Dr. Gotlieb based on the signature. *Id.* at 582, 586.

found Dr. Palmeri's findings to be "largely subjective," noted Dr. Palmeri had opined that Morales was only moderately partially disabled and could do sedentary work activity, and observed that Dr. Palmeri did not include the total hours Morales could work in his RFC questionnaire. *Id.* at 462. ALJ Levin also found Dr. Boppana's October 15, 2008 letter declaring Morales "totally disabled and unable to work" to be conclusory. *Id.* ALJ Levin took note of Dr. Falvo's conclusion that Morales did not have any limits to his ability to work, stating that "[w]hile that is doubtless an overstatement, it does help illustrate how extreme, in the other direction, claimant's assertions are." *Id.* at 464.[16] ALJ Levin also gave considerable weight to the opinion of Dr. Charles Plotz, a medical expert called to testify at the hearing after reviewing Morales' records. Dr. Plotz found that Morales had no Listings-level impairments, and could do sedentary exertional activity. *Id.* at 463.[17]

ALJ Levin was also influenced by Morales' activities that "simply do not fit the picture of a person as seriously impaired as he claims to be, and to have been for more than seven years now." *Id.* at 464. In particular, he noted Morales' travel to the Dominican Republic, which led to a courtship with his now-wife, Morales' responsibility in caring for his ailing father, and his home in a fifth-floor walkup apartment. *Id.*

---

[16] Upon remand, the Appeals Council found that Dr. Falvo's opinion "was not supported by objective medical evidence, particularly, magnetic resonance imaging (MRI) . . . and/or by nerve testing." AR at 730–31.

[17] Upon remand, the Appeals Council found that Dr. Plotz's findings "were adversely affected by material omissions and factual inconsistencies." AR at 731.

After determining Morales' RFC, ALJ Levin found Morales was unable to perform any of his past relevant work. *Id.* at 466. Finally, at step five, ALJ Levin identified a significant number of jobs in the national economy that Morales could perform, including order clerk, sedentary assembly jobs, and machine tending jobs. *Id.* at 466–67. Thus, ALJ Levin concluded that Morales was not disabled within the meaning of the Social Security Act. *Id.* at 467.

Following Morales' filing of a federal complaint, the parties stipulated to a remand for further administrative proceedings on July 1, 2013. *Id.* at 733. The Appeals Council Order thereafter directed the ALJ to:

> [(1)] Give further consideration to the treating and nontreating source opinions . . . and explain the weight given to such opinion evidence . . . [(2)] Give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations . . . [(3)] Obtain evidence from a medical expert to clarify the nature and severity of the claimant's impairment . . . [and (4)] If warranted by the expanded record, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base. . . ."

*Id.* at 694–95.

### 3. ALJ Dorf's May 5, 2014 Decision

On May 5, 2014, ALJ Dorf issued a decision denying Morales' application. ALJ Dorf divided his disability analysis into two periods: 1) June 28, 1999 through October 6, 2002, and 2) October 7, 2002 onward.

### a.    June 28, 1999 through October 6, 2002

At step one, ALJ Dorf found that Morales had not engaged in substantial gainful activity since June 28, 1999. *Id.* at 671. At step two, ALJ Dorf found that Morales had the following severe impairments: degenerative disease of the cervical and lumbar spine; left shoulder rotator cuff impingement/tear, status post left shoulder surgery in August 2002; and a medial meniscal tear of the left knee. *Id.* at 672. ALJ Dorf stated that the medical record did not support Morales' claims of frequent headaches and dizzy spells or support Morales' claims of a severe mental impairment. *Id.* At step three, ALJ Dorf found Morales did not have impairments that met or medically equaled a listed impairment. *Id.* at 673. At step four, ALJ Dorf found Morales had the residual functional capacity to:

> . . . perform sedentary work, . . . with an option to change sit/stand positions at will; only occasional handling and reaching with the non-dominant left upper extremity, no postural activities except occasional stairs; and no work in loud noise environments, defined as street, road, and traffic work, except he needed to take frequent unscheduled breaks during the day and could not reliably keep a work schedule, secondary to pain.

*Id.* He then found that Morales was unable to perform past relevant work, and, at step five, that no jobs existed in significant numbers in the national economy that Morales could have performed. *Id.* at 676. ALJ Dorf found that Morales' impairments could reasonably produce the alleged symptoms, and that Morales' statements are generally credible for the period up to October 6, 2002. *Id.* at 675. He found that "medical improvement" occurred as of October 7, 2002, based primarily on Dr. Sosina's note on October 6, 2002 where she stated that Morales

was capable of returning to "full duty" as a computer technician. *Id.* Thus, ALJ Dorf concluded that Morales was disabled within the meaning of the Social Security Act only between June 28, 1999 and October 6, 2002. *Id.* at 676.

### b. October 7, 2002 onward

ALJ Dorf denied Morales' application for benefits for the period of time after October 6, 2002. *Id.* at 689. At step one, while ALJ Dorf did not address SGA explicitly, in a later section of his decision he stated: "Although I credit claimant's testimony that he has not worked at SGA-level, claimant's work activity indicates he is not as functionally limited as alleged." *Id.* at 685. At step two, ALJ Dorf found that Morales had the following severe impairments: degenerative disease of the cervical and lumbar spine, medial meniscal tears of the bilateral knees, and since October 2008, a partial tear of the left rotator cuff. *Id.* at 677. At step three, ALJ Dorf found no impairment or combination of impairments that met or equaled a listed impairment. *Id.* He observed that no treating or examining physician had indicated findings that met a listed impairment, and Dr. Sreedevi Chandrasekhar, the expert present at the hearing, testified that none of Morales' impairments since October 7, 2002, "individually or in combination," met Listing-level severity. *Id.*

At step four, ALJ Dorf found that Morales' RFC increased beginning October 7, 2002. *Id.* His RFC calculation remained the same as the pre-October 7 period, but did not include the language: "needed to take frequent unscheduled breaks during the day and could not reliably keep a work schedule, secondary to pain." *Id.* at 677. As mentioned above, ALJ Dorf gave significant weight to Dr. Sosina's

opinion that Morales regained the ability to work as of October 6, 2002. *Id.* at 677, 686. ALJ Dorf did take note of Dr. Cabatu's treatment notes, which found Morales totally disabled in late 2003, but opined that those notes referred to Morales' left knee surgery in October. *Id.* at 678. He found that by March 2004, Dr. Cabatu "reverted to his initial assessment that the claimant was only partially disabled." *Id.* at 679. ALJ Dorf observed that "[d]espite [his] allegations of unremitting symptoms," Morales "obtained only sporadic medical treatment for the next year." *Id.* He specifically pointed out that Morales saw Dr. Gotlieb in July 2004, who directed Morales to follow up in two weeks if the pain in his neck continued. *Id.* Morales did not return to the office until December 2004, when he was seen by another physician for back pain. The physician found Morales had normal clinical findings, including negative straight leg raising, and his lumbar x-ray results were normal. *Id.* ALJ Dorf noted that Dr. Gotlieb's progress notes found that Morales' symptoms "improved with conservative treatment" and Morales had "very good pain control." *Id.* ALJ Dorf gave little weight to Dr. Gotlieb's 2005 opinion that Morales could not perform even sedentary exertional work, which he opined was not supported by medical evidence or Dr. Gotlieb's own progress notes. *Id.* at 687. He also observed that Dr. Gotlieb was an internist, not a specialist. *Id.*

ALJ Dorf commented that Dr. Palmeri "repeatedly indicated . . . that claimant could work in a limited (but unspecified) capacity," and that he did not change his diagnosis even after Morales' lumbar MRI in January 2006. *Id.* at 680. He also noted that Dr. Palmeri opined that Morales could sit two hours at a time

and stand/walk two hours at a time, but did not provide the total hours Morales could sit/stand/walk in a workday. *Id.* However, on August 15, 2006, Dr. Palmeri characterized Morales' limitations as "moderate partial disability." *Id.* ALJ Dorf found no medical evidence to sustain Dr. Palmeri's assessment that Morales could not reach with the right upper extremity and could not travel by bus or subway; he therefore gave little weight to that portion of the assessment. *Id.* at 686.

ALJ Dorf observed that Dr. Boppana diagnosed Morales with lumbosacral and cervical radiculopathy in November 2006, but an electrodiagnostic study in March 2007 was negative for cervical radiculopathy (though consistent with lumbar radiculopathy). *Id.* at 680.[18] ALJ Dorf stated that Dr. Boppana opined "conclusorily" that Morales was totally disabled and unable to work in October 2008, but found no evidence in the record that Morales sought additional treatment until 2014. *Id.* at 681.[19] ALJ Dorf then turned to a consultative examination he ordered in 2014 by Dr. Woods, which found no "clinical basis for a definitive medical diagnosis." *Id.* at 682. ALJ Dorf compared Dr. Woods' examination to a medical report by Dr. Bioh, Morales' treating internist. *Id.* He found Dr. Bioh's opinion that Morales could only sit 30 minutes continuously, stand 10 minutes continuously, and walk 5 minutes continuously to be unsupported by the underlying record. *Id.* He

---

[18] This examination was specifically of the lower extremity and lumbar paraspinal muscles. AR at 556. There is no indication that the study tested the cervical spine area.

[19] It is clear from this statement that Dr. Bioh's treatment notes were not part of the 2014 record. They were also not originally part of the 2017 record; plaintiff's counsel provided those notes at the beginning of the 2017 hearing. AR at 997.

gave limited weight to Dr. Bioh's assessment because Dr. Bioh did not begin treating Morales until 2011, and "[appear]ed to have relied on [Morales'] statements for his functional assessment." *Id.* at 688. ALJ Dorf gave significant weight to Dr. Chandrasekhar's opinion that Morales' impairments did not meet a listed impairment. *Id.*

ALJ Dorf acknowledged that Morales does have "objective diagnostic evidence of cervical, lumbar, left shoulder, and bilateral knee impairments," but he noted that Dr. Chandrasekhar opined that the impairments did not support a finding of disability. *Id.* at 683. He observed that none of Morales' treating physicians or specialists "considered it necessary to update the cervical spine MRI since 1999, or the lumbar spine MRI since 2006" or advise Morales to have cervical or lumbar surgery. *Id.*[20] ALJ Dorf opined that a "close review of the treating records reveals that claimant's symptoms have waxed and waned in severity. . . [with] periods of symptom exacerbation, . . . but these episodes have been infrequent, fairly brief, and largely self-limiting or alleviated by medication . . . . [A]ll of claimant's impairments have been managed conservatively." *Id.* ALJ Dorf also found Morales' "self-described activities to be inconsistent with the degree of disability alleged." *Id.* at 684. ALJ Dorf noted Morales' ability to take care of his

---

[20] Morales had lumbar spine MRIs in 2010, 2012, and 2016. AR at 869, 989. His 2012 lumbar spine MRI, which shows "no evidence of lumbar spinal stenosis," referred to his 2010 lumbar spine MRI, which is not in the record. *Id.* at 989. ALJ Dorf likely did not have access to either the 2010 or 2012 MRI. The 2012 MRI appears to have been added to the record with Dr. Bioh's treatment notes in 2017. Morales also had a cervical spine MRI in 2016. *Id.* at 871.

family, courtship of his wife, independent self-care, and daily exit from his fifth-floor walk-up apartment. *Id.* at 684–85. ALJ Dorf also stated that Morales "commuted to recording studios throughout the City and dealt with talent, customers, and partners," and started Emence Records, a manufacturer and distributor of music products. *Id.* at 685.[21]

After determining Morales' RFC, ALJ Dorf found Morales was unable to perform any of his past relevant work. *Id.* at 688. Finally, at step five, ALJ Dorf, aided by a vocational expert's testimony, found a significant number of jobs in the national economy that Morales could perform, including ticket counter, surveillance systems monitor, and order clerk. *Id.* at 689. Thus, ALJ Dorf concluded that Morales was not disabled within the meaning of the Social Security Act after October 7, 2002. *Id.*

On June 28, 2016, the Appeals Council remanded ALJ Dorf's decision because the hearing tape had been certified as lost. *Id.* at 663.

### 4. ALJ Dorf's September 28, 2017 Decision

On September 28, 2017, ALJ Dorf issued a decision denying Morales' application. *Id.* at 655–60. ALJ Dorf determined that Morales had engaged in SGA since October 7, 2002, and, as a result, did not consider any of the remaining steps of the five-step inquiry as to whether Morales was disabled. *Id.* at 658.

---

[21] Because the May 2014 hearing tape was lost, the Court does not have Morales' testimony concerning these activities, and ALJ Dorf did not further inquire about Emence Records at the March 2017 hearing.

ALJ Dorf observed that Morales started Cloud Med in 2014 and is "president of said company." *Id.* He stated that Morales had worked since 2002 as a sound engineer and graphic designer, and in 2014, started a business called Emence Records. *Id.* With Emence Records, he actively engaged with producers and was "'constantly' on the phone with other producers." *Id.* ALJ Dorf "credit[ed]" Morales' prior testimony that he had not worked at an SGA level, and that his earnings were below SGA level. *Id.* ALJ Dorf asserted, however, that the regulations required examination of other factors for self-employed persons. *Id.* He described the three tests for self-employment. *Id.* at 659. He then cursorily analyzed all three tests in a single paragraph, stating:

> The work claimant described he performed for his businesses was of significant value to the viability of each business. As a sound engineer and graphic designer, he commuted to recording studios throughout the city and dealt with talent customers and partners. He did actual recording, editing, and arranging. At Emence Records, LLC, he was actively engaged in trying to get other producers to enter into a productive agreement to work under the label. At Cloud Med Transport, LLC, he was active in securing drivers and contracting with health providers for the company and purchased ambulances.

*Id.* As a result, ALJ Dorf concluded that Morales was not disabled within the meaning of the Social Security Act. *Id.*

**C.    Analysis**

Morales argues that the latest ALJ decision should be reversed and his claim should be remanded solely for the calculation of benefits because: (1) no evidence that he ever engaged in SGA exists in the administrative record (Pl. Mem. at

14–22); and (2) the record provides "persuasive proof of disability and . . . further evidentiary proceedings would serve no purpose." *Id.* at 22 (quoting *Parker*, 626 F.2d at 235). The Commissioner agrees that the ALJ's decision should be reversed and remanded, because the ALJ failed to develop the record regarding Morales' SGA and did not evaluate the medical evidence. Def. Mem. at 2–14. However, the Commissioner disagrees that Morales' claim should be remanded solely for the calculation of benefits because: (1) after developing the record, the ALJ may reasonably find that Morales engaged in SGA; and (2) several medical examinations suggest that Morales was not completely disabled and could perform a range of work. *Id.* at 14–16. In his reply, Morales reiterates that: (1) the record contains no evidence of SGA, and finding evidence of SGA in further hearings is "almost purely fanciful"; and (2) no substantial evidence contradicts the opinions of his treating physicians. Pl. Reply at 1–9.

For the reasons discussed below, the Court concludes that the ALJ improperly reconsidered Morales' work activity prior to 2014 in his SGA analysis, and failed to adequately develop the record because he did not obtain additional documents or testimony concerning Morales' business ventures post-2014. The Court also concludes that the record does not provide "persuasive proof of disability" for the entire period of alleged disability because several gaps exist in Morales' medical history with no treatment records or diagnostic exams, and the various treating physicians' opinions exhibit inconsistencies and deficiencies that could be remedied with further development of the record.

1. **The ALJ Improperly Reconsidered Morales' Pre-2014 Work Activity in His SGA Analysis**

As an initial matter, this Court takes issue with ALJ Dorf's determination that Morales engaged in SGA between 2002 and 2014. In his May 5, 2014 decision, ALJ Dorf specifically found: "The claimant has not engaged in substantial gainful activity since June 28, 1999." AR at 671. Then, in 2017, after not inquiring at all about pre-2014 work activities during Morales' hearing, ALJ Dorf inexplicably found: "The claimant has engaged in substantial gainful activity since October 7, 2002." *Id.* at 658. How ALJ Dorf made this complete about-face is bewildering to the Court, and his 2017 decision did not explain why he changed his mind. His 2017 decision states only:

> [Morales] testified that he has worked at his own business since 2002 as a sound engineer and graphic designer. He commuted to recording studios throughout the city and dealt with talent customers and partners. He did actual recording, editing, and arranging. He testified he was able to use his hands to do sound engineering, and use a mouse, keyboard, and other devices.

*Id.* Morales did not in fact testify to these activities at the 2017 hearing. Perhaps he had testified to these activities in 2014, because ALJ Dorf used the exact same language in his 2014 decision. *Id.* at 685. And yet ALJ Dorf found that Morales had not engaged in SGA based on the exact same facts in 2014. *Id.* at 671.

Social Security regulations do provide that, on remand, "[a]ny issues relating to your claim may be considered by the administrative law judge whether or not they were raised in the administrative proceedings leading to the final decision in your case." 20 C.F.R. § 404.983. However, the "law of the case doctrine," "while not

52

binding, counsels a court against revisiting its prior rulings in subsequent stages of the same case absent 'cogent' and 'compelling' reasons such as 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Ali v. Mukasey*, 529 F.3d 478, 490 (2d Cir. 2008) (quoting *United States v. Tenzer,* 213 F.3d 34, 39 (2d Cir. 2000)); *see also Calderon v. Astrue*, 683 F. Supp. 2d 273, 276 (E.D.N.Y. 2010) ("[N]umerous other courts have held that [law of the case doctrine] appl[ies] with equal force to administrative proceedings, including Social Security appeals.") (compiling cases).

In this case, no "new evidence" came to light regarding Morales' pre-2014 work activities during the intervening period between ALJ Dorf's decisions. ALJ Dorf makes no reference to any new information that he did not have when making his 2014 decision. The administrative record contains no new documents and the 2017 hearing contains no new testimony about Morales' work prior to 2014. ALJ Dorf thus had no "cogent" or "compelling" reason to reconsider his decision regarding Morales' SGA activity prior to 2014. Accordingly, on remand, the ALJ shall not reconsider Morales' ability to engage in SGA prior to 2014.

### 2. The ALJ Did Not Adequately Develop the Record for Morales' Post-2014 Work Activity

As Morales testified to starting two businesses in 2014, ALJ Dorf properly reconsidered Morales' ability to engage in SGA for the period after 2014. However, ALJ Dorf did not adequately develop the record. As the Commissioner herself recognizes, "it is unclear whether the record includes all necessary relevant evidence," and the ALJ "misstated the record." Def. Mem. at 9. ALJ Dorf's analysis

finding that Morales had engaged in SGA is limited to a single paragraph, with only general conclusions about the nature of Morales' work.  AR at 659.

As Morales is a self-employed person, income "is not a reliable factor in determining SGA. . . . An individual's services may help build up capital assets during a period of development where no profits are evident . . ." SSR 83-84 at *1. ALJ Dorf applied the three-part test for self-employed persons in his analysis, but failed to develop the record for a proper analysis.

"Test One" requires examining whether the claimant's services are "significant" and whether his income from the business is "substantial."  20 C.F.R. § 404.1575(a)(2)(i).  "Significant" services means "more than half the total time required for management of the business" or "more than 45 hours a month."  20 C.F.R. § 404.1575(b).  "Substantial" income means any net income that (i) exceeds the guidelines in 20 C.F.R. § 404.1574(b), or (ii) is "comparable to what it was before [the claimant] became seriously impaired," or is "comparable to . . . unimpaired self-employed persons in [the claimant's] community who are in the same or similar business as their means of livelihood."  20 C.F.R. §§ 404.1575(c)(2)(i)–(ii).  ALJ Dorf sought no information about how many hours Morales worked for Cloud Med or Emence Records in each year since 2014.  While Morales' tax records since 2014 indicate that his net income does not exceed the applicable guidelines, ALJ Dorf should have undertaken a more complete analysis comparing Morales' income to: (1) his income before he was impaired, and (2) the income of unimpaired individuals in

the same or similar business. Pl. Mem. at 11; AR at 751. ALJ Dorf did not properly apply Test One.

"Test Two" requires an examination as to whether the claimant's work activity "in terms of factors such as hours, skills, energy output, efficiency, duties, and responsibilities, is comparable to that of unimpaired individuals in [the claimant's] community who are in the same or similar business as their means of livelihood." 20 C.F.R. § 404.1575(a)(2)(ii). Each of these work factors should be analyzed and described in detail. SSR 83-84 at *9. For Cloud Med, ALJ Dorf asked only a few questions about Morales' involvement, and did not solicit any clarifying information. AR at 1008. Based on his 2014 decision, ALJ Dorf asked more questions about Emence Records in 2014, yet neglected to do the same in 2017. *Id.* at 685. ALJ Dorf should also have sought evidence beyond Morales' own testimony, including people with "firsthand knowledge of the impaired individual's work situation obtained through actual participation or observation." SSR 83-84 at *9. Morales has a business partner with Emence Records and two business partners with Cloud Med who could have provided information on Morales' involvement with the companies. AR at 1003, 1005. Among other things, Morales' partners at Cloud Med could explain Morales' role as "President" of the company. *Id.* at 1008. They could also explain in greater detail the new "business plan" that Morales' counsel alluded to in his April 6, 2017 letter to ALJ Dorf — a plan that "will make the operation truly profitable because they will be able to secure much better contracts from health care institutions." *Id.* at 916.

ALJ Dorf also should have identified a group of unimpaired persons "who are in the same or similar business as their means of livelihood" as a comparison point for Morales; "[w]ell established businesses are generally the most reasonable choice for comparison." SSR 83-84 at *9. Morales contends in his motion papers that "[t]here is quite literally **no evidence** in the administrative record identifying other persons in Mr. Morales' community (New York City) who were unimpaired and made their living as self-employed operators of recording studios . . . [or] who run ambulette services." Pl. Mem. at 18 (emphasis in original). However, the Court does not agree, as Morales suggests, that no evidence will necessarily turn up on this point. Pl. Reply at 2. On remand, the ALJ should develop the record to determine if there are comparable operators of recording studios or persons who run ambulette services or the equivalent. To that end, SSR 83-84 encourages fact-finders to conduct a "personal interview with an unimpaired self-employed individual from the selected group." SSR 83-84 at *9. ALJ Dorf did not properly apply Test Two.

"Test Three" requires an analysis as to whether the claimant's work activity "is clearly worth the amount shown in [the earning guidelines] when considered in terms of its value to the business, or when compared to the salary that an owner would pay to an employee to do the work [the claimant is] doing." 20 C.F.R. § 404.1575(a)(2)(iii). ALJ Dorf similarly did not conduct a specific analysis of Morales' work factors for Test Three. Additionally, the administrative record does not include comprehensive earnings or financial statements of either Cloud Med or

Emence Records. After the hearing, Morales' counsel provided bank records for Cloud Med between January 2017 and March 2017, and offered to obtain additional records if ALJ Dorf requested. AR at 917. ALJ Dorf did not do so. Thus, ALJ Dorf failed to properly apply Test Three as well.

On remand, the ALJ should seek additional information about Emence Records and Cloud Med from Morales, Morales' business partners, representative persons who are self-employed owners of recording studios or ambulette services, and, if necessary, "data supplied by outside authorities (*e.g.* county agents, etc.)" on the comparability or worth of services. SSR 83-84 at *10. The ALJ should also obtain comprehensive business records for Cloud Med and Emence for the period of 2014 through 2017. Finally, the ALJ should conduct an analysis under the three-part test that describes in detail each required work factor.

### 3. The Record Does Not Provide "Persuasive Proof of Disability" for the Entire Period of Alleged Disability

Morales requests that this Court remand his case solely for the calculation of benefits, rather than for further administrative proceedings. A court may remand solely for the award of benefits when "the records provide[ ] persuasive evidence of total disability that render[s] any further proceedings pointless." *Williams,* 204 F.3d at 50. However, "[w]hen there are gaps in the administrative record or the ALJ has applied an improper legal standard, [courts] have, on numerous occasions, remanded to the [Commissioner] for further development of the evidence." *Pratts,* 94 F.3d at 39 (quoting *Parker*, 626 F.2d at 235) (alteration in original). Only where

the record is complete and provides "persuasive proof" of disability, can the courts remand solely for calculation of benefits.

For example, in *Balsamo v. Chater*, the Second Circuit remanded a case for the calculation of benefits where the ALJ had rejected treating physicians' disability determinations "solely on the basis that the opinions allegedly conflicted with the physicians' own clinical findings." 142 F.3d 75, 80 (2d Cir. 1998). The ALJ did not identify "**any** medical opinion to dispute the treating physicians' conclusions that [the claimant] could not perform sedentary work." *Id.* at 81 (emphasis in original). The ALJ in that case also attempted to support his conclusion that the claimant could perform sedentary work by observing that the claimant owned a motor vehicle and "continues to carry a gun." *Id.* The Second Circuit observed that neither fact established that the claimant "'engaged in any of these activities for sustained periods comparable to those required to hold a sedentary job.'" *Id.* (citing *Carroll v. Sec'y of Health & Human Servs.,* 705 F.2d 638, 643 (2d Cir. 1983)).

In a more recent case in this District, the court remanded a case solely for the calculation of benefits where the claimant originally applied for benefits in 1994. *Carlantone v. Colvin*, 14-CV-8204 (DF), 2015 WL 9462956, at *1 (S.D.N.Y. Dec. 17, 2015). In that case, multiple ALJs had issued six adverse decisions: three decisions were remanded by the Appeals Council (one of which because the hearing tape had been lost), one was remanded by stipulation from the district court, and one was remanded by a district judge who identified multiple legal errors. *Id.* at *1–2. The court found the record to be complete, and "there is certainly no reason to believe

that any treater or consultant would now be able to produce additional records that would augment any clinical assessments that they made at the relevant time." *Id.* at *11.[22] The court also observed the claimant's treating physician repeatedly found him to be "totally disabled" and "unable to perform other full-time work"; that the consultative examiner relied on by the ALJ provided an opinion "so vague as to render it useless"; and the claimant testified that he rarely left the house and could hardly get out of bed. *Id.* at *12–13 (citing *Curry v. Apfel*, 209 F.3d 117, 123 (2d Cir. 2000)). The court also found the ALJ's "repeated failure to weigh the medical opinions properly, even after [having been] explicitly instructed . . . to do so" as a reason for remanding solely for the calculation of benefits. *Id.* at *14.

In this case, the Court finds that the administrative record is not fully developed and it does not demonstrate "persuasive proof of disability." First, the ALJ erred in not seeking important treatment records and additional information for notable gaps in Morales' treatment. Second, Morales' treating physicians' records and his own testimony do not provide "persuasive evidence of total disability" for the entire period in question in order for this Court to remand solely for the calculation of benefits.

---

[22] In *Carlantone*, the claimant was last insured on December 31, 1998. 2015 WL 9462956, at *2, n.3. Therefore, the court only had to consider whether the claimant was disabled between the alleged onset date and the date he was last insured — a period of approximately four years. In this case, Morales' alleged period of disability spans almost 17 years. Unlike in *Carlantone*, Morales' record is not fully developed in that lengthy time period and contains contrary evidence of disability.

### a.     The ALJ Erred in Not Fully Developing the Record

In his 2014 decision, ALJ Dorf observed: "Significantly, however, apart from one visit to Dr. Kaplan in December 2008, there is no evidence in the record of any medical treatment for more than five years, from October 2008, when Dr. Boppana pronounced the claimant disabled, until January 17, 2014." AR at 681. However, based on the record now available before the Court, Morales did receive medical treatment from Dr. Bioh (between at least 2011 and 2015), and several diagnostic exams during that time period. On January 24, 2012, for example, Morales received a lumbar MRI. *Id.* at 990. The technician opined: "Since the previous lumbar MRI dated 4/1/10, the patient has developed a mild left paracentral disc protrusion at L5-S1 which contacts the descending left S1 nerve root. . . . No additional new lumbar disc herniations are identified. There is no evidence of lumbar spinal stenosis." *Id.*[23] The 2012 MRI also revealed the existence of another MRI in 2010, which is not part of the current record. The record does not contain treatment notes of any doctor between late 2008 and late 2011 that could explain who ordered the 2010 MRI. In the further review of Morales' claim, the ALJ should consider Dr. Bioh's notes and the 2012 MRI in his analysis, obtain the 2010 MRI, and inquire if Morales saw any other doctors between 2008 and 2011.

---

[23] Given its location in the record, this exam likely was added to the record along with Dr. Bioh's treatment notes from 2011 onward. Based on the 2017 hearing transcript, Dr. Bioh's notes and this exam were not added to the record until after the 2017 hearing. AR at 997.

In addition, throughout his testimony and in his records with multiple treating physicians, Morales consistently cited to his physical therapy sessions. *Id.* at 427, 629. During his 2009 hearing before ALJ Levin, for example, Morales testified that he would "get six weeks" of physical therapy every year. *Id.* at 629. He also testified that "[he] really liked the one where [Boppana] do their stuff . . ." *Id.* In his visits to Dr. Gotlieb, Morales also reported that physical therapy was helping, and Dr. Gotlieb noted that Morales had very good pain control and physical therapy. *Id.* at 595, 604. However, the entire administrative record contains only one treatment record of Morales' physical therapy sessions. *Id.* at 600–01. In this record, at an initial session on July 5, 2006, the therapist recorded Morales' complaints and stated: "The patient's rehabilitation potential is good. Patient appears motivated. Patient is able to perform exercises correctly. Patient's progress toward goals is good. Tolerance to treatment is good." *Id.* at 601. In *Rosa v. Callahan*, the Second Circuit found that the ALJ committed legal error by failing to seek additional information from a physical therapist who saw the claimant "on a regular basis over a significant period of time." 168 F.3d at 80. Consistent with *Rosa*, upon remand, the ALJ should seek out Morales' physical therapy records.[24]

Moreover, no ALJ has yet evaluated Morales' medical records or RFC after 2014, which includes the treatment notes of Dr. Kohler and the affidavit of Dr. Palvia from 2016. ALJ Dorf did not consider Morales' medical condition in his 2017

---

[24] While more than ten years have passed since many of Morales' sessions, the one available record is in electronic format and thus others may still potentially be available.

decision. The Second Circuit has remanded cases for further administrative proceedings where an ALJ ended his analysis without considering the remaining sequential steps. *See, e.g., Brickhouse v. Astrue,* 331 F. App'x 875, 878 (2d Cir. 2009) ("[T]he Commissioner has not had the opportunity to try to show that there is other work that [the claimant] can perform, and we cannot order an award until the Commissioner has had that chance."). In further proceedings, the ALJ should request that Dr. Kohler perform an RFC analysis and obtain treatment notes from Dr. Palvia (to provide support for his medical statement to the SSA on December 6, 2016). AR at 905.

### b. Morales' Treating Physicians' Records and his Own Testimony Do Not Provide "Persuasive Evidence of Total Disability"

In *Selian,* the Second Circuit held that substantial evidence did not support the ALJ's RFC determination or the conclusion that the claimant did not suffer from an impairment. 708 F.3d at 420. However, the court declined to remand the case solely for the calculation of benefits because the claimant "has not shown that he is entitled to benefits based on the record." *Id.* The court declined to do so because the treating physicians' diagnoses appeared "tentative" and a treating medical professional "suspected [the claimaint] of malingering." *Id; see also Tomlinson v. Astrue,* 11-CV-2477, 2012 WL 346458 (JG), at *2 (E.D.N.Y. Feb. 2, 2012) (finding of disability not "only reasonable outcome" so no remand for calculation of benefits).

Several aspects of the record preclude the Court from finding "persuasive evidence of total disability." *Williams*, 204 F.3d at 50. Unlike in *Carlantone* and *Balsamo*, where the treating physicians' underlying records consistently referred to their patients as totally disabled and unable to work, *Carlantone,* 2015 WL 9462956 at *2–3; *Balsamo,* 142 F.3d at 77, in Dr. Palmeri's records, he repeatedly stated that Morales could work in a limited capacity. AR at 526, 529, 532, 535, 538, 541, 544.[25] In addition, Dr. Gotlieb consistently commented that Morales' symptoms were "well-controlled" and that he had "very good pain control." *Id.* at 593, 604. Dr. Gotlieb also reported that Morales told him in his initial visit that he exercised two to three times a week. *Id.* at 571. In his 2014 decision, ALJ Dorf provided several other examples of Morales' daily activities, which were more substantial than, for example, the activities of the claimant in *Balsamo* who rarely left his home. *Id.* at 684–85; *Balsamo,* 142 F.3d at 81; *see also Micheli v. Astrue*, 501 F. App'x 26, 28–29 (2d Cir. 2012) (treating physician's statements that back pain was well-controlled and claimant was performing light-to-moderate activity supported ALJ's finding that claimant could perform sedentary work).

Dr. Bioh's medical opinion is also called into question by Dr. Woods' consultative examination. While "[i]n *Balsamo*, the ALJ rejected the treating source's opinion notwithstanding the lack of a contrary medical opinion," where a

---

[25] Dr. Palmeri's RFC analysis also did not include the total hours that Morales could sit, stand, or walk. AR at 400. *See Smith v. Berryhill*, 740 F. App'x 721, 724 (2d Cir. 2018) ("A treating physician's opinion may also be rejected if it is internally inconsistent or otherwise uninformative.") (citing *Halloran*, 362 F.3d at 32.)

contrary opinion exists, the ALJ is "permitted to consider [the treating physician's] treatment notes in weighing the opinions of [the treating physician and the consultative examiner]; and she was permitted to conclude that [the consultative examiner's] opinion was more reliable." *Camille v. Colvin*, 652 F. App'x 25, 28 (2d Cir. 2016) (quoting *Balsamo,* 142 F.3d at 81). While the opinions of Dr. Falvo and Dr. Plotz, which the Appeals Council found to be deficient, cannot be relied on as substantial evidence, Dr. Woods' evaluation has not been "rejected by one or more of SSA's decision makers." Pl. Mem. at 22.

Finally, it remains an open question as to the weight that should be given to Dr. Hansen, the only physician to conclude that Morales had a Listings-level impairment since 2002, as the SSA has not yet assessed Dr. Hansen's testimony. However, Dr. Hansen's testimony cannot be considered "persuasive evidence of total disability," because he only surveyed other physicians' records; the transcript makes clear that he did not have access to at least some of Morales' treating history; and he was present at the hearing only by telephone and never personally examined Morales. *See Hidalgo v. Bowen*, 822 F.2d 294, 298 (2d Cir. 1987) (testimony of medical expert who never examined claimant and relied on incomplete medical records did not constitute substantial evidence).

Given the incompleteness of the record, the Court expresses no opinion on the ultimate merit of Morales' claim at this time. But the current record does not allow the Court to remand solely for the calculation of benefits. It needs to be further developed to determine if and when Morales was disabled.

### 4. The ALJ Must Resolve Morales' Claim Within 120 Days

The final matter which the Court must address is the question of delay.

Morales applied for benefits in 2003. More than 15 years have now passed. As

courts have acknowledged, disability determinations are "often painfully slow" and

"a remand for further evidentiary proceedings (and the possibility of further appeal)

could result in substantial, additional delay." *Michaels,* 621 F. App'x at 41 (quoting

*Butts,* 388 F.3d at 387). Understanding the continued hardship faced by the

claimant, courts have seen fit to impose deadlines on the Commissioner to make

final decisions. *See, e.g., Michaels*, 621 F. App'x at 41 (120 days to finish further

proceedings); *Butts v. Barnhart,* 416 F.3d 101, 103 (2d Cir. 2005) (120 days to finish

further proceedings)*; Gonzalez-Cruz v. Comm'r of Soc. Sec.,* 16-CV-6613 (MWP),

2018 WL 3151656, at *3 (W.D.N.Y. June 27, 2018) (120 days to finish further

proceedings)*; Cruz v. Colvin*, 15-CV-1463 (AJP), 2015 WL 5813158, at *1 (S.D.N.Y.

Oct. 6, 2015) (120 days to finish further proceedings); *Turkus v. Astrue*, 11-CV-3887

(FB), 2012 WL 3877617, at *5 (E.D.N.Y. Sept. 7, 2012) (60 days to finish further

proceedings); *Tomlinson v. Astrue*, 2012 WL 346458, at *2 (90 days to render final

decision).

Mindful of Morales' understandable frustration with the protracted

administrative process, this Court will also impose a deadline such that the ALJ

must complete all further administrative proceedings within 120 days of the date of

this Opinion and Order. This deadline is additionally necessary in light of the

"egregious" delay that Morales has experienced. *Hilsdorf v. Comm'r of Soc. Sec.,*

724 F. Supp. 2d 330, 355 (E.D.N.Y. 2010). Unlike in 2014, in a new decision in 2019, Morales will have changed age categories since he first applied in 2002. 20 C.F.R. § 404.1563; AR at 688 ("The claimant's age category has not changed since October 7, 2002."). In the aforementioned cases where courts have imposed deadlines after acknowledging long delays, the claimants had applied for benefits five to eight years prior to the courts' decision. *See Michaels*, 621 F. App'x at 41 (8 years); *Cruz*, 2015 WL 5813158, at *4 (6 years); *Tomlinson*, 2012 WL 346458, at *2 (5 years); *Turkus*, 2012 WL 3877617, at *5 (6 years). Morales' wait of 15 years makes the imposition of a deadline all the more imperative.

Finally, if upon remand the ALJ denies Morales' claim, the Commissioner must issue a final decision within 60 days of any appeal from that denial. If the Commissioner does not adhere to the deadlines set forth herein, and any delay is not attributable to Morales, a calculation of benefits owed to Morales must be made immediately. *See Gonzalez-Cruz,* 2018 WL 3151656, at *3 (imposing same deadlines and conditions); *Turkus,* 2012 WL 3877617, at *3 (same).

## III.   CONCLUSION

For the foregoing reasons, Morales' motion for judgment on the pleadings is granted in part, the Commissioner's cross-motion is granted in part, and the case is remanded pursuant to sentence four of 42 U.S.C. § 405(g).

On remand, the ALJ is instructed to take the following actions:

(1)   Fully develop the record regarding Morales' post-2014 work activity.

(2)   Fully develop the record for the period between 2008 and 2014, including obtaining the 2010 MRI and medical records from any treating physicians.

(3)   Assess the weight that should be given to Dr. Bioh's opinion in light of his treatment notes now available in the record.

(4)   To the extent possible, obtain physical therapy records since October 7, 2002.

(5)   Obtain all treatment notes from Dr. Palvia, and obtain an RFC opinion from Dr. Kohler; assess the weight that should be given to their opinions.

(6)   Hold a new hearing at which the ALJ shall call a vocational expert to testify; obtain a new consultative examination from a physician who will have access to the full record and who will physically examine Morales; reassess Morales' credibility; and complete the necessary five-step analysis to determine Morales' eligibility for benefits.

(7)   Render a decision within 120 days of the date of this Opinion and Order.

The Clerk is respectfully directed to close Docket Number 17, and enter judgment granting Morales' motion in part and the Commissioner's cross-motion in part, and to reverse the determination of the Commissioner and remand this case for further administrative proceedings.

**SO ORDERED.**

Dated: December 6, 2018
       New York, New York

_____
JAMES L. COTT
United States Magistrate Judge